IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DANIEL R. LUCAS,

    Petitioner,                             No. CIV S-07-1455 LEW GGH P

    vs.

CLAUDE FINN,

    Respondent.                           <u>FINDINGS AND RECOMMENDATIONS</u>

    _____/

I. <u>Introduction</u>

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 1982 petitioner was convicted of first degree murder with use of a firearm and sentenced to 27 years to life.

        This action is proceeding on the amended petition filed July 23, 2007. Petitioner challenges the February 23, 2006, decision by the California Board of Prison Hearings (BPH) finding him unsuitable for parole. After carefully reviewing the record, the court recommends that the petition be denied.

/////

/////

/////

1

II. <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. <u>Neelley v. Nagle</u>, 138 F.3d 917 (11th Cir.), citing <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. <u>Moore v. Calderon</u>, 108 F.3d 261, 263 (9th Cir. 1997).

In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. <u>Id</u>. at 1519.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. <u>Williams (Terry)</u>, 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Williams (Terry)</u>, 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

The Superior Court of Orange County was the last state court to issued a reasoned decision addressing the claims raised in the instant petition. Respondent's Answer, Exhibits E, F. G. Accordingly, the court considers whether the denial of these claims by the Superior Court was an unreasonable application of clearly established Supreme Court authority. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (when reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision).

/////

III. <u>Background</u>

The background of petitioner's offense is summarized in the transcript from the 2006 suitability hearing:

> Records of the Westminster Police Department reflect that on October 10, 1981, at approximately 11:17, officers were dispatched to an industrial complex located on Pendant to investigating [sic] an occurrence of a probable homicide. Upon arriving at the location, contact was made to [sic] the security guard who related that while making his rounds he observed a pick-up truck back into one of the parking spots and both doors of the vehicle were opened. He added that he shined his spotlight into the vehicle and observed the body of a male subject later identified as twenty-five year old VanHecke, V-A-N-H-E-C-K-E, to be lying in a pool of blood beside the vehicle. It was determined that the victim suffered at least two gunshot wounds to the torso and may have been dead since approximately around 9:00 p.m. Considerable amount of blood was discovered at the scene and was traced to a second pool of blood located approximately two feet east of the original one. Also (indiscernible) the pick-up was located on the front fender and hood. Another pool of blood was located six feet in front of the truck. A third pool of blood was located approximately twelve feet (indiscernible) of the victim's vehicle. Also officers noted that the glove box of the victim's vehicle was open (indiscernible) keys in the ignition. An autopsy was subsequently conducted and four gunshot wounds were evident on the victim's body. It was ascertained that the victim had [sic] shot once in the back–downward trajectory, once in the chest–upward trajectory, once in the left kneecap–downward, once in the left kneecap–downward, once in the right temple of head–downward trajectory and a .38 caliber slug was removed from the victim's left leg; and another was removed from his throat. (Indiscernible) thorax was determined to be the cause of death. During the course of the subsequent investigation it was established that the victim was an employee of the Red Mustache hair saloon, that he had told another employee that he was going to sell an ounce of cocaine to an individual, later identified as the defendant, on that particular evening. The witness added that he was aware that the victim had on previous occasion [sic] sold cocaine to the defendant and had referred to the defendant as a flake that he did not trust. Further the witness stated that the victim had (indiscernible) going to sell the cocaine to the defendant because he needed the money badly and he would net two-hundred dollars from the sale. Also the victim's brother attested to the fact that the victim had been trying to put together cocaine for the defendant for the past week and it involved an ounce of cocaine. Also he stated that he heard his brother say that he did not trust the defendant. Eventually the brother (indiscernible) individual identified as Michael McMahaon, M-C-M-A-H-A-O-N, had supplied his brother with the cocaine to be sold to the defendant. McMahon was subsequently contacted and acknowledged that he supplied the victim with cocaine on several occasions, usually in small amounts. Then on October 9, 1982, the victim had asked him to get an ounce of cocaine. McMahon stated that he agreed to do so but the following day he learned from the victim that the deal had not been completed because the defendant partner [sic] had gone to get his portion of the money in larger bills, and as a result the deal would be consummated after work. McMahon stated that until that time he was unaware of the identity of the buyer [sic] told the victim to cancel the deal because he did not like the sounds of

it and did not trust the defendant. McMahon explained that in the past the defendant bought some cocaine from the victim but failed to pay the full amount. Also he stated that he knew the defendant did not have the money to buy an ounce of cocaine. In addition he maintained that he would have never agreed to provide the victim with the cocaine had he been made aware of the fact that the defendant was the buyer. According to McMahon, the victim usually went to the defendant's house and the defendant would go to the victim's house to make the sale. In addition he could not think of any reason why the victim would go to an isolated location with the defendant. Finally, he stated that the victim generally carried cocaine either in the glove compartment or in the compartment located in the driver's door of his vehicle. That cocaine, which had been given to the defendant on that particular date was in the driver's door of his vehicle. That cocaine, which had been given to the defendant on that particular date was packaged in a clear cellophane bag. In the meantime the defendant was contacted in his residence and he acknowledged that on October 10, 1981, at approximately 5:00 p.m. he had met the victim for a beer at that Terla Restaurant, T-E-R-L-A. He added that he left the restaurant at approximately 5:30 p.m., spent the remainder of the evening with his children. After being informed that the victim had been found dead the defendant admitted that he was supposed to have met the victim to buy some cocaine from him, but he was unable to raise the money (indiscernible) who was supposed to go with him. He stated that as a result he met the victim (indiscernible) transpired (indiscernible) permission from the defendant to examine the vehicle where traces of blood were located on it. The victim claimed that he hit a dog a few days before but stated, "I might as well tell you the truth." After being advised of his rights the defendant related that he and the victim had arranged to meet in an industrial complex, and "he" referred to the defendant, (indiscernible) to buy and [sic] ounce of cocaine from the victim. The defendant stated, "However, as it turned out he could not located (indiscernible) the two hundred dollars needed for the purchase of cocaine." He stated that as a result he proceeded to the industrial complex to inform the victim that he could not buy the cocaine (indiscernible) the victim was bleeding and had been shot. At that point the investigating officer informed Lucas of how the victim (indiscernible). The defendant added that he became frightened and immediately left the location. In regards to blood on his vehicle, related that the victim had leaned on the car, referring to the defendant, but tried to wash off the blood. Permission was obtained from the defendant to search his residence and acknowledge ownership of a .22 caliber derringer, a .22 caliber magnum pistol, an antique .32 caliber pistol and a rifle. He maintained there was [sic] no other weapons on the premises. The weapons in question were located along with .38 caliber ammunition and an empty holster for a two-inch .38 pistol. A search warrant was subsequently obtained and the two-inch .38 caliber pistol, which was determined to be the murder weapon, was located in the defendant's garage. Also, several bags of marijuana, several vials of what was believed to be cocaine were retrieved from the defendant's residence. Also, marijuana products were seized from the defendant's backyard. The defendant was subsequently arrested and booked at the Orange County Jail for homicide.

Now the prisoner's version in this case:

The defendant was interviewed at the Orange County Jail on two separate occasions and he submitted a written statement in regards to the murder charge for which he's been convicted, the defendant wrote, "I was in a [sic] moderate use of cocaine at the time of the incident. I had some dealings with the deceased prior to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

the incident. Apparently he was having heavy financial problems at the time and try [sic] threatening me harm [sic] to my children and myself (indiscernible) so he could pay off his debt. I had told him the day before that I would not have any money for what he was trying to push on me, but I would try to contact somebody that he had mentioned wanting some the previous week. I never made contact with that person and told him so at that time of meeting with him. He wouldn't listen to me and persisted with threats, which developed into an argument. At that point I did grab the weapon, which was in my vehicle, and there was a scuffle over it when it went off. I was so scared at that point, wondering if somebody else was coming. I saw him going for something else under the seat of his vehicle (indiscernible) shot him again and the [sic] left scene." Also, the defendant stated that at the time he was not dealing drugs, strictly buying. He estimated that he spent three or four hundred dollars per month for cocaine and he had purchased cocaine from the descendent [sic] between fifteen and twenty times over a period of a year and a half. Prior sales had taken place in a variety of locations including parking lots, behind restaurants and at their homes. He remarked every sale was in a different place. Defendant added that prior to the incident in question that he was carrying a gun for approximately eight months for protection. He added that as a result of having entered the drug scene, he heard that pressure moves and robberies (indiscernible) possessed the gun strictly for protective reasons. Also he stated that VanHecke was aware of the fact that he carried a gun, in that he had shown it to him the previous week. Upon questioning the defendant insisted that he'd never been involved with any other shootings. As background the defendant related that it had become apparent to him the VanHecke was having financial problems, that he–referring to VanHecke–kept asking him to buy cocaine, but he didn't really need it. The defendant stated that he had helped VanHecke out several times buy [sic] making purchases, but the last couple times he had done business with him the cocaine did not seem pure and it was white. The defendant stated that he felt that he was being cheated and (indiscernible) VanHecke thought that he was breaking off the sales. Defendant advised as a result, VanHecke started threatening him and insisted he purchase one ounce of cocaine, which was referring to (indiscernible), according to VanHecke [sic], had obtained. Defendant related that he told that the first part of the week VanHecke would call him and tell him that he had some stuff and that he would [sic] it be appreciated if he would bring the defendant without (indiscernible). Defendant remarked, "We have a business-type arrangement, he needed money." The defendant added that later in the week he told Van Hecke that he had a friend who (indiscernible) cocaine. As it turned out he could never get a hold of his friend. He stated that in the meantime he received two threatening phone calls from VanHecke to the effect that VanHecke had told him connection [sic] that cocaine was for him, referring to the defendant, and that as a result it was his–referring to the defendant–responsibility and he would have to buy it. The defendant stated that he was particularly concerned about the fact that not only he, but his children, would be in danger if he did not cooperate. According to the defendant VanHecke chose a location where the sale was to take place. He stated that he was familiar with the area but had never been to that specific location before. He added that from home conversations that he had with VanHecke he got the impression that (indiscernible) mysterious people at the location could harm him. He remarked "The connection could have been a few blocks a way or my house close by." The defendant reiterated that the same concern at the time was to prevent harm coming to his children. The defendant related that when he arrived at the complex he and

1  VanHecke talked for a few minutes when VanHecke started threatening him
   again. According to the defendant, VanHecke told him that he given [sic]
2  (indiscernible) the defendant's address. The defendant remarked, "I didn't like it
   because my kids were alone." He advised that he began to argue. At the time
3  VanHecke was leaning over the door of his car and had reached down. Defendant
   remarked, "He knew the gun was there from the week before." The defendant
4  stated that reaching down for the gun, Vanhecke grabbed for his wrist and the gun
   went off. The defendant remarked, "I'm not a professional shot. I wasn't trying
5  to shoot the first shot and we were wrestling with the gun." He stated that during
   the struggle he began to fall out of his car and gun [sic] went off again. Defendant
6  remarked that, "It was a lot of exciting. I pulled the trigger as I was falling."
   Defendant stated that at that point he was not even sure VanHecke had been shot.
7  Defendant stated that VanHecke got up and started to walk towards him as if he
   was going to attack him and that he fired again. In regard to the fourth shot,
8  defendant stated that VanHecke went to his truck, again looking under his seat,
   which made him think he was trying to locate a weapon. Defendant stated that as
9  a result he fired again. He remarked, "I didn't know what was going on. It was
   crazy." The defendant argued that the shooting was definitely pre-meditated. He
10 added that the weapon he had in his possession was for his protection and it was
   not unusual for him to carry one. Also, he reiterated that he was concerned about
11 the possibility of (indiscernible) being in the area. Upon questioning the
   defendant admitted that it occurred to him to call the police to get help for
12 VanHecke but he was concerned about his children and he was concerned about
   some supposed charactered coming after him. He remarked, "I was terrified and
13 totally confused." Upon direct query the defendant denied having seen any
   cocaine at the scene of the shooting and stated that earlier in the day VanHecke
14 had brought a sample of cocaine to his residence. Also insisted that he had never
   saw [sic] the victim's car keys. The defendant advised that immediately after the
15 shooting he did not feel that what he had done was wrong because he lacked a
   good self-defense. That he's remorsefully [sic] now because at one time he and
16 VanHecke had been friends. He remarked, "I feel really bad. We did get along
   before this. The calls started when I rejected him." The defendant stated that he
17 did not consider himself a violent person. He would never deliberately harm
   anyone and remarked, "The only thing I've done physical has been in self-
18 defense."

19 Respondent's Answer, Exhibit B, pp. 7-20.

20 IV.  Discussion

21        The amended petition raises three claims all challenging the sufficiency of the

22 evidence supporting the 2006 decision finding petitioner unsuitable for parole.

23        Since the approximate five years since the issuance of McQuillion v. Duncan, 306

24 F.3d 895 (9th Cir. 2002), we know this about the liberty interest implicated by California's

25 parole laws regarding indeterminate sentences, i.e., parole suitability hearings, which if

26 successful for the petitioner, will result in the establishment of an actual parole date (but never

less than the minimum term):

1. A liberty interest exists, Irons v. Carey, No. 05-15275, 2007 WL 2027359 (9th Cir. July 13, 2007), rehearing en banc denied, 2007 WL 3256594 (Nov. 6, 2007), citing cases;

2. Reliance on unchanging factors in denying parole suitability *might* implicate a violation of that liberty interest. Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003);

3. A finding by the Board of Parole Hearings (formerly BPT) (or at a later time, by the Governor) concerning the circumstances or gravity of the crime in and of itself is sufficient to deny suitability; In re Rosenkrantz, 29 Cal. 4th 616, 682, 128 Cal. Rptr. 2d 104, 161; Irons, at * 5; but the nature of the offense must be "particularly egregious" to constitute a basis to deny parole suitability. Rosenkrantz, 29 Cal. 4th at 683, 128 Cal. Rptr. 2d at 161.

4. However, "particularly egregious" means nothing more than finding elements in excess of those "minimally necessary to convict." In re Dannenberg, 34 Cal. 4th 1061, 1095, 23 Cal. Rptr. 3d 417, 440 (2005);

5. If the petitioner has served less than the minimum term of his indeterminate sentence, "all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." Irons at * 6, but see footnote 1 of Irons expressing no opinion if the prisoner has served more than his minimum term, i.e., *maybe* that is the time frame against which reliance on unchanging factors is truly suspect[1];

6. If the BPH determined that the crime was vicious, or performed in a callous manner, or the motive was trivial, and so forth – all factors relating to the circumstances of the

---

[1] Nothing in California statutes or regulations, see Cal. Penal Code 3041, 15 CCR § 2402, would expressly so limit the decision of the BPH and Governor, thus the potential limitation must be of federal origin. However, as undue reliance on unchangeable factors has never been found thus far by the Ninth Circuit, the commencement point of the limitation, or the precise blend of crime circumstances and years since, has not been defined. We do know that in Irons, five times of application was insufficient. Irons did not decide that reliance on unchanging factors after the minimum term had been served was unlawful. We simply know that "maybe" that will be the case.

crime – and such is adopted by the state courts on review, a federal court must find the state court decision(s) AEDPA-unreasonable before a writ of habeas corpus may be granted.  <u>Irons</u>, <u>supra</u>.

With respect, after <u>Irons</u>, the undefined "mights" and "maybes" serve as an indecipherable present guide to knowing just when the liberty interest in parole may be violated by reliance on unchanging factors.  Moreover, one does not know whether such reliance, if it is ever held to be insufficient, is based on passage of time alone, or is an uncertain blend of crime circumstances and passage of time.  The state courts' adoption of the BPH (BPT[2]) or Governor's decision about the circumstances of the crime is now essentially unreviewable – at least prior to the expiration of the minimum term.  That is, the circumstances of the crime in terms of viciousness, callousness, triviality and the like, is essentially an unchanging value judgment whose correctness cannot often be disputed regardless of the time when such a judgment is made – right after the conviction, just prior to expiration of a minimum term, well after the expiration of a minimum term. [3]

Review of the federal appellate cases demonstrates that no guided finding of undue reliance on unchanging factors can be made in this case.  <u>Biggs v. Terhune</u>, <u>supra</u>, the case that commenced the discussion on unchanging factors, involved the first degree bludgeoning murder of a witness facilitated, but not committed, by Biggs.  He was denied parole eligibility at his initial hearing in 1999 in part because of the gravity of the crime.  All might agree that such a

---

[2] The Board of Prison Terms recently had its name changed to the Board of Prison Hearings.

[3] The undersigned has previously determined the arbitrary nature and lack of predictive value generally found in a circumstances of the crime parole suitability denial based on unchanging circumstances despite the passage of sixteen years and more from the date of the conviction coupled with an unblemished prison record.  See <u>Irons v. Warden of California State Prison-Solano</u>, 358 F. Supp. 2d 936, 947 (E.D. Cal. 2005).  That analysis, focusing on the predictive nature of the crime for future violence in combination with expert psychiatric reports or other forward looking evidence, has been cited with approval by the California Court of Appeal.  <u>In re Elkins</u>, 144 Cal. App. 4th 475, 50 Cal. Rptr. 3d 503, 522 (2006); <u>In re Scott</u>, 133 Cal. App. 4th 573, 34 Cal. Rptr. 3d 905 (2005).  However, since that analysis only received the comment that it was an "understandable [AEDPA] error" in the concurrence of Judge Reinhardt, that analysis concerning the trigger time of undue reliance will not be utilized herein.

murder was grave, and it will never be properly classified as anything but such.  Nevertheless, the Ninth Circuit found that "continued reliance" on unchanging factors could violate due process.  Although not stating such, the intimation of Biggs was that the third or fourth time of reliance on the circumstances of the crime would be too much.  Certainly, it was not understood by the undersigned from reading Biggs that the time at which continued reliance would be too much would occur in 2010 – the time at which Biggs will have served his minimum term.  Biggs' minimum term is served in 2010, and Biggs will have had approximately 5 or 6 more hearings by that time.  However, subsequent Ninth Circuit cases have not upheld the undersigned's reading of Biggs.

In Sass, no comparison review of other cases was undertaken, there was simply the one sentence holding that the "evidence of Sass' prior offenses [prior DUIs] and the gravity of his convicted offenses [DUI resulting in a death and injury] constitute some evidence to support the Board's decision."  Id., 461 F.3d 1123; the dissent disagreed, and found AEDPA unreasonableness.  The Ninth Circuit was reviewing a third denial of suitability.  If jurists of the Ninth Circuit cannot agree whether the circumstances of the crime can constitute some evidence given three hearings, how will the BPH or the undersigned know when to stop using the circumstances of a crime as the reason to deny parole eligibility.  What will be the analytical watershed point of departure from routinely upholding the BPH assessment of the circumstances of the crime, and more importantly, why?  Will the fourth hearing be sufficient, or should it be the seventh?  Will the analysis simply hinge on the non-analytical fact that Sass will have passed his minimum terms of years under his sentence?  Would a later BPT finding of egregiousness be AEDPA unreasonable simply because Sass just passed his minimum term as opposed to just before the expiration of his minimum term?  None of these questions have been answered.

In Irons, after five parole suitability hearings, the Ninth Circuit determined that the second degree murder of a perceived thieving drug dealer by a wildly shooting, and then stabbing, angry "victim" of the deceased was comparatively more egregious than the murder in

1  Sass. Perhaps so; perhaps other jurists would locate this line in another position because of the
2  societal impact that drunk drivers impose in this country. Both positions have their points. But
3  one can validly question whether the ultimate goal of every parole eligibility hearing,
4  determining *future* safety of the community, can forever be based on personal judgments on the
5  comparative seriousness of crimes committed decades ago.

6  Nevertheless, taking an implied cue from Irons that the minimum term might
7  serve as an analytical change point, the undersigned finds that prior to that time, absent
8  extraordinary circumstances, the BPH determination on factors relating to the circumstances of
9  the crime are essentially unreviewable, i.e., the determination constitutes "some evidence"
10 sufficient to deny parole eligibility (suitability). In the instant case, at the time of the at-issue
11 2006 suitability hearing, petitioner had served 24 years. Because he had not yet served the
12 minimum term of 27 years, the BPH's reliance on factors relating to the crime constituted "some
13 evidence" absent extraordinary circumstances.[4]

14 In petitioner's case, the BPH found that the offense was carried out in a
15 dispassionate and calculated manner, see Cal. Code Regs. tit. 15, § 2402(c)(1)(B) (offense carried
16 out in dispassionate and calculated manner tends to show unsuitability), demonstrated a callous
17 disregard for human suffering, id., § 2402(c)(1)(D) (offense carried out in manner demonstrating

---

[4] Nearly the same day as Irons was decided, the Ninth Circuit reversed a grant of parole eligibility in Kunkler v. Muntz, 2007 WL 683970 (9th Cir. 2007). The facts of the second degree murder were not set forth in the opinion, but the fact of Kunkler's 1983 conviction, and the fact that Kunkler had been considered for parole suitability *ten times* were set forth. Kunkler had been imprisoned well beyond any minimum term. On his last two BPT (now BPH) hearings, the commissioners had found Kunkler suitable for parole, but the Governor reversed both decisions in part on his perception of the seriousness of the crime. Indeed, this was *the* ground on which the state courts in unpublished orders had ultimately upheld the Governor's decision. The district court applied the Biggs dictum regarding reliance on unchanging factors. In reversing the district court, the Ninth Circuit, citing Sass, viewed the Biggs dictum as merely advice to the *next BPH panel* that it might wish to depart from its continued reliance on a non-changing factor. Kunkler at *2 ("'it is not [this court's] function to speculate about how future parole hearings could proceed.'"). Evidently, no matter how many times the BPH and/or the Governor utter an undoubtedly correct conclusion that a murder is serious, or a motive trivial, or that the victim suffered, these unchanging factors will always constitute "some evidence" in federal habeas corpus review.

callous disregard for human suffering demonstrates unsuitability), and the motive for the crime was inexplicable, id., § 2402(c)(1)(E) (inexplicable or trivial motive tends to show unsuitability). Answer, Exhibit B, pp. 57-58.

In finding that the offense demonstrated a callous disregard for human suffering, the BPH observed that petitioner left the victim in the parking lot to die. Id. The BPH stated that an ambulance could have been called. Id. As discussed above, the victim was shot four times, including in the right temple of his head. The suggestion that petitioner left the victim laying in the parking lot, still alive, suffering from his wounds is not supported by the evidence.

The BPH found that the murder was calculated based on the fact that petitioner shot the victim four times including, as discussed above, in the right temple of his head. Id. The BPH also found that the motive for the offense was inexplicable or trivial because it was based on drugs. Id. at 58. Applying the standards set forth in Irons for reviewing a BPH suitability finding for a prisoner who has not served his minimum term, the court finds that these findings are supported by some evidence.

If the undersigned were reviewing this matter on a clean slate, the undersigned would not analyze the liberty interest involved merely by reference to a checklist of crime circumstances and whether the BPH understood that a murder was callous or the motive trivial. Nevertheless, no binding authority at present would require more than use of the checklist for the circumstances of the crime factors as "some evidence" upon which to deny parole suitability.

For the reasons discussed above, the court finds that the denial of petitioner's claims by the Superior Court was not an unreasonable application of clearly established Supreme Court authority.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty

1  days after being served with these findings and recommendations, any party may file written
2  objections with the court and serve a copy on all parties.  Such a document should be captioned
3  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
4  shall be served and filed within ten days after service of the objections.  The parties are advised
5  that failure to file objections within the specified time may waive the right to appeal the District
6  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 12/17/07

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

luc1455.157